FILED

02/19/2021

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
September 29, 2020 Session

## STATE OF TENNESSEE v. CODY RYAN KING

**Appeal from the Circuit Court for Morgan County**
**No. 2012-CR-52    E. Eugene Eblen, Judge**
**Jeffrey Wicks, Judge**

_____

### No. E2019-01404-CCA-R3-CD

_____

The Defendant, Cody Ryan King, was convicted by a Morgan County Circuit Court jury of rape of a child, a Class A felony, attempted rape of a child, a Class B felony, two counts of aggravated sexual battery, a Class B felony, two counts of sexual battery, a Class E felony, and attempted statutory rape, a Class A misdemeanor. *See* T.C.A. §§ 39-13-522 (2010) (subsequently amended) (rape of a child), 39-13-505 (2018) (sexual battery), 39-13-504 (2018) (aggravated sexual battery); 39-13-506 (2010) (subsequently amended) (statutory rape); 39-12-101 (2018) (criminal attempt). The Defendant was sentenced to an effective twenty-five years for the convictions. However, at the motion for new trial hearing, the trial court ordered a new trial for one count of aggravated sexual battery on the basis that the State failed to make an election of the offenses. The court, likewise, ordered a new trial for both counts of aggravated sexual battery and both counts of sexual battery on the basis that the Defendant received the ineffective assistance of counsel for the failure to request a jury instruction on the lesser included offense of assault by offensive or provocative contact. As a result, the court ordered a new trial for two counts of aggravated sexual battery and two counts of sexual battery. On appeal, the Defendant contends that (1) the evidence is insufficient to support his rape of a child and attempted rape of a child convictions and (2) he received the ineffective assistance of trial counsel. Because the Defendant received the ineffective assistance of counsel during the pretrial proceedings, we vacate the Defendant's convictions and remand the case to the trial court with instructions for the State to reinstate the eight-year plea offer and to negotiate in good faith.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Reversed;**
**Case Remanded**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and D. KELLY THOMAS, JR., JJ., joined.

Robert R. Kurtz and Richard L. Gaines (on appeal and at motion for new trial), Knoxville, Tennessee; and Daniel Forrester, Mart Cizek, and Sal Varsalona (at trial), Clinton, Tennessee, for the appellant, Cody Ryan King.

Herbert H. Slatery III, Attorney General and Reporter; Garrett D. Ward, Assistant Attorney General; Russell Johnson, District Attorney General; Robert Edwards and Alyson Kennedy, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

The Defendant's convictions relate to his sexual assault of six minors: P.N., A.B.1., A.B.2., B.B.1., B.D. and T.M.[1] The grand jury returned a ten-count indictment. On the day of the trial but before it began, two counts of sexual battery and one count of aggravated sexual battery were dismissed. The offenses occurred in 2010 and 2011, and the trial occurred in 2015.

At the trial, Jeff Vittatoe, former investigator for the District Attorney General's Office, testified that in February 2012, he was assigned to assist Morgan County Sheriff's Detective Samuel Hamby with the present case. Mr. Vittatoe stated that he scheduled and attended child forensic interviews of the victims and that, based upon the interviews, he and Detective Hamby obtained search warrants for the Defendant's cell phone records, Facebook records, home, and two vehicles. Mr. Vittatoe stated that items seized during the search were sent to the Tennessee Bureau of Investigation (TBI) for analysis. He said that the Defendant was detained during the search of the home and that the Defendant agreed to an interview.

On cross-examination, Mr. Vittatoe testified that he reviewed the Defendant's Facebook records and that the records did not reflect conversations between the Defendant and the victims. Mr. Vittatoe agreed that the cell phone records only reflected phone numbers and text messages and that the records did not contain any "details about what was sent."

A.B.1. testified that he was age seventeen at the time of the trial and that he was age fourteen when he met the Defendant at a New Year's Eve party on December 31, 2010. He said that at an unspecified time after the holiday, he received a text message from the Defendant asking if he wanted to "go mowing" with the Defendant to earn money. A.B.1. said that sometime in November 2011, he received a message from the Defendant asking if he wanted to go hunting with the Defendant. A.B.1. said that he and the Defendant "went up on the tree farm and stayed" and hunted. A.B.1. said that after they had seen two or

---

[1] It is the policy of this court to refer to minors and victims of sexual assault by their initials.

three deer, the Defendant "reached in my pants and grabbed my . . . genital area, and said gobble, gobble." A.B.1. said that he and the Defendant both sat on the front seat of the Defendant's Geo Tracker when the incident occurred. A.B.1. said that the Defendant squeezed his penis and that A.B.1. pulled the Defendant's hand out of his pants, moved to the backseat of the Geo Tracker, and told the Defendant to take him home. A.B.1. said that the Defendant did not say anything at this time, that the Defendant drove him home, and that before he left the Defendant's vehicle, the Defendant told him "not to tell anybody" because A.B.1. would "get in trouble." A.B.1. said that the Defendant did not contact him again until "the night that everything came out." A.B.1. said that his father answered the phone when the Defendant called. A.B.1. said that he did not speak to the Defendant after the incident. A.B.1. stated that he submitted to a forensic interview to discuss the incident. He identified a photograph of himself taken at the time of the interview.

On cross-examination, A.B.1. testified that he had not heard of "gobble, gobble" before the incident. He denied hearing of it at his school and knowing what it meant. He said that he spoke to the Defendant every three or four days in the time leading up to the hunting trip. A.B.1. agreed that he previously accused the Defendant of the same conduct when he and the Defendant mowed lawns in June 2011. A.B.1. said that he "probably" sent approximately 2,000 text messages to the Defendant between February 2011 and the end of the year. A.B.1. said he was "a little bit" afraid of the Defendant. When asked why he continued to communicate with the Defendant if he were afraid of the Defendant, A.B.1. stated that "everybody else" said the Defendant "was an all right guy." A.B.1. said that he first disclosed the incident in December to a friend, that the friend told the friend's parents, and that the friend's parents contacted A.B.1.'s parents. A.B.1. denied telling anyone else about the incident but agreed he spoke to P.N. about the incident after "it all came out."

On redirect examination, A.B.1. testified that he and the Defendant were friends. A.B.1. thought the Defendant had been age twenty-one at the time of the incident. A.B.1. said that he somewhat "looked up to" the Defendant before the incident. When asked what occurred while he and the Defendant mowed lawns, A.B.1. said, "Same thing happened." A.B.1. said that as he sat inside the Defendant's green Dodge truck, the Defendant "reached over and (indiscernible) and says gobble, gobble again." A.B.1. said that the Defendant touched A.B.1.'s genitals above his clothes, that he moved to the backseat and scooted away from the Defendant, and that he told the Defendant to drive him home. A.B.1. said that this incident occurred in Knox County around June 2011.

A.B.1. testified that the Defendant touched A.B.1.'s genitals under his clothes during the hunting trip. A.B.1. agreed that he ended contact with the Defendant after the hunting trip because he knew the Defendant would not stop.

B.D. testified that he was age fifteen at the time of the trial and that he was age eleven in November 2011. He said that he and the other victims were friends at school and

that A.B.1. and B.B.1. were his cousins. B.D. said that before he spoke to the police, he only discussed the incidents with A.B.1. and B.B.1.

B.D. testified that he and the Defendant attended the same church and that they became friends. B.D. said that he looked up to the Defendant, who did "fun things." B.D. said that in November 2011, the Defendant invited him to "go riding" on the "top of Gobe." B.D. recalled that he and B.B.1. rode around in the Defendant's red Dodge truck at night, that B.D. sat on the front passenger seat, and that B.B.1. sat on the backseat behind B.D. B.D. said that his parents allowed him to go with the Defendant on this night.

B.D. testified that at some point during the ride, the Defendant reached over, touched his "genital area" above his clothes and said "gobble, gobble." B.D. said that the Defendant looked at him when he said "gobble, gobble," that he felt uncomfortable, and that he did not give the Defendant permission to touch him. B.D. said that he "kind of went along with it cause I didn't really know how to react at that moment." B.D. said that B.B.1. "just kept to himself" during the incident but that afterward, the Defendant did the same thing to B.B.1. B.D. said that B.B.1. did not say anything after being touched but that "he just wasn't himself" afterward. B.D. said that they continued riding around for another hour before the Defendant took them to B.D.'s home. B.D. said that he and B.B.1. did not discuss the incidents at this time and that B.D. was embarrassed. B.D. said that he did not discuss the incident with anyone at school before the police spoke to him.

B.D. testified that, after the Defendant touched him, the Defendant asked B.D. to touch the Defendant below the Defendant's clothes. B.D. said that he did not respond to the Defendant's request and did not touch the Defendant. B.D. said that the Defendant asked B.B.1. to do the same. B.D. said that after the incident, he continued talking to the Defendant because they attended the same church but that he did not "hang" with the Defendant any longer. B.D. recalled that the Defendant invited him to go riding again and that he declined the invitation.

On cross-examination, B.D. testified that the Defendant touched him with the palm of the Defendant's hand. When asked why he told the forensic interviewer that the Defendant used the back of the hand, B.D. said he was terrified of participating in the interview. He agreed he initially denied that the Defendant touched him. B.D. said that his mother told him to "fess up" about the incident. He agreed he told the forensic interviewer that the incident was "kind of a joke."

On redirect examination, B.D. testified that his mother wanted him to tell the truth and that she worried the Defendant would escape punishment for touching B.D. He identified a photograph of himself taken at the time of the second forensic interview. He said that he had never seen anyone play the "gobble, gobble" game. He said that although he told the forensic interviewer that he thought it was a game played in high school, he was

-4-

unsure. He said that the Defendant and the Defendant's friends played the game, which is why he associated the game with high school.

B.B.1., A.B.1.'s brother, testified that he was age fifteen at the time of the trial and that he and the Defendant were friends "until that all happened." B.B.1. said in November 2011, the Defendant touched his "private area." B.B.1. said that he, the Defendant, and B.D. were riding in the Defendant's red Dodge truck when the incident occurred. B.B.1. said that he sat in the backseat of the Defendant's truck, that the Defendant drove, and that the Defendant reached behind the seat and "grabbed [his] privates and said gobble, gobble." B.B.1. said that the Defendant touched him above his clothes. B.B.1. said that he pushed the Defendant's hand away, that he told the Defendant to stop, and that the Defendant did not say anything. B.B.1. said that B.D. did not say anything during the incident and that B.B.1. saw the Defendant do the same thing to B.D.

B.B.1. testified about an incident that occurred mid-fall 2011, during which he and his brother were riding in the Defendant's red Dodge truck "up on Gobe." B.B.1. recalled that the leaves were "all different colors." He said that the Defendant did "the gobble, gobble thing" and attempted to have B.B.1. and his younger brother kiss. B.B.1. said that he sat in the rear seat, that the Defendant reached behind the seat, and that the Defendant touched him above the clothes on his private area. B.B.1. identified a photograph of himself taken at the time of the forensic interview and said he was age twelve at this time. B.B.1. said that he did not give the Defendant consent to touch him and that he did not like what the Defendant did.

On cross-examination, B.B.1. testified that he first heard the expression "gobble, gobble" from the Defendant. B.B.1. agreed that B.H. and B.H.'s brothers, who were a couple of years older than B.B.1., had done the "gobble, gobble thing" to B.B.1. He explained that they "grabbed your junk and squeezed a little bit and said gobble, gobble." He denied that B.H. and B.H.'s brother learned this from being on the football team. B.B.1. said that the last time anyone touched him was the second incident involving the Defendant.

B.B.1. testified that the Defendant did not attempt to do anything else, did not proposition him, and did not attempt to kiss him. B.B.1. said that the Defendant did not do anything else to make him feel uncomfortable. B.B.1. agreed he discussed the Defendant's touching with his brothers and B.D. B.B.1. denied telling anyone at school and his parents.

On redirect examination, B.B.1. said that B.H.'s brothers were in the ninth grade when they did the "gobble, gobble thing." B.B.1. recalled that he was in the sixth grade and that the Defendant was older and did not attend high school. B.B.1. said that he did not interact with the Defendant after the second incident.

T.M. testified that he was age seventeen at the time of the trial, that he knew the other victims from school, and that he was related to A.B.2. T.M. said that he had "not really" talked to the other victims about the incidents. T.M. said that he met the Defendant by "hanging out with other people" T.M.'s age. He said that although he saw the Defendant with people the Defendant's age, the Defendant mostly associated with younger people. T.M. said that he attended middle school and high school basketball games and races with the Defendant.

T.M. testified that in the summer of 2011, he, a couple of other people, and the Defendant rode "up on Gobe" in the Defendant's "four-wheeler." T.M. recalled that the Defendant asked T.M. to join him multiple times and that T.M. went riding multiple times because he enjoyed riding the four-wheeler. T.M. stated that on one occasion when he and the Defendant were alone at Gobe, the Defendant "tried to pull [my] head over to his private and stuff and then he tried taking his to mine and I just fought him away." T.M. said that the Defendant unzipped T.M.'s pants and touched T.M.'s penis above the clothes. When asked about the duration of the touching, T.M. initially said, "It just depends like most of the time I would just fight him off." T.M. recalled, though, that the touching lasted about five seconds during this first incident. He said that he did not consent to the Defendant's touching and that he told the Defendant to stop three or four times before the Defendant stopped.

T.M. testified that later on the same evening, the Defendant opened T.M.'s pants and touched T.M.'s penis again.[2] T.M. said that the Defendant leaned over and attempted to place the Defendant's mouth on T.M.'s penis but that T.M. fought the Defendant "away from it." T.M. said that he knew the Defendant attempted to put his mouth on T.M.'s penis because the Defendant was six or seven inches from T.M.'s penis. T.M. said that he did not consent to the Defendant's touching and that he told the Defendant to stop "because . . . there ain't no need for it." T.M. said that immediately afterward, the Defendant attempted to pull T.M.'s head to the Defendant's private area. T.M. said that the Defendant's penis was exposed, that the Defendant had an erection, and that T.M. "fought him away." T.M. recalled telling the Defendant "to stop." T.M. testified that although the Defendant never attempted to touch T.M. with the Defendant's mouth again, the Defendant continued touching T.M. with the Defendant's hand. T.M. said that the Defendant's mouth never touched T.M.

T.M. testified that he went riding again with the Defendant because he enjoyed riding the four-wheeler. He said that he had not discussed the incident with anyone before he spoke to the police. He identified a photograph of himself taken at the time of the forensic interview.

---

[2] The record is unclear whether the touching was above or below his clothes. The prosecutor asked, "So this is – again this is out – inside your clothing again?" The victim said, "Yes."

On cross-examination, T.M. testified that the Defendant said "gobble, gobble" during the incident he previously described. T.M. denied hearing the expression before the incident. He said that the Defendant drove during the incident and agreed that the road was "fairly winding." On redirect examination, T.M. clarified that the initial touching and the Defendant's saying "gobble, gobble" occurred when the Defendant drove but that the remainder of the incident occurred when the truck was stopped.

A.B.2. testified that he was age sixteen at the time of the trial. He said that between December 2010 and December 2011, he spent time with the Defendant after meeting the Defendant at church. A.B.2. did not know the Defendant's age but said the Defendant was in his twenties at the time of the incidents. A.B.2. said that after getting to know the Defendant, the Defendant invited him to go "[r]iding on the mounts and Gobe." A.B.2. recalled that it was fall, that he thought many people were going riding on four-wheelers, and that he "was wrong." He said that the Defendant picked him up from home, that his parents gave him permission to go with the Defendant, that they were alone in the Defendant's truck, and that, during the drive, the Defendant asked if "the turkey was still popular in school." A.B.2. said that he asked the Defendant what he meant and that the Defendant reached over, grabbed A.B.2.'s genitals with his palm, and said "gobble, gobble." A.B.2. denied that he had played this "game" with anyone previously and said that it was not a game. A.B.2. said that initially the Defendant touched him above the clothes and that he pushed the Defendant's hand away. A.B.2. said that the Defendant stated he was "just goofing off."

A.B.2. testified that later during the drive, the Defendant placed his hand on and rubbed A.B.2.'s genitals and "forced" A.B.2. to rub the Defendant's genitals. A.B.2. said that initially the Defendant touched him above his clothes but that the Defendant unzipped A.B.2.'s pants. A.B.2. said that he attempted to push the Defendant's hand away and that he did not understand what was occurring. A.B.2. said that the Defendant stated he was "goofing off." A.B.2. said that after a period of time, the Defendant unzipped the Defendant's pants and pushed A.B.2.'s hand down inside the Defendant's pants. A.B.2. said that the Defendant had an erection, that "[i]t was just back and forth," and that the Defendant touched A.B.2. and made A.B.2. touch the Defendant.

A.B.2. testified that he returned to Gobe with the Defendant at an unspecified time because the Defendant told A.B.2. that he "didn't have a choice." A.B.2. said that the same thing happened again. A.B.2. said that the Defendant touched him and wanted him to touch the Defendant. A.B.2. said that at some point, he began making up excuses to avoid going anywhere with the Defendant. A.B.2. said that the Defendant began asking A.B.2.'s parents for permission to take A.B.2. riding before speaking to A.B.2. and that, as a result, he returned to Gobe with the Defendant. A.B.2. thought he and the Defendant went to Gobe about twenty or more times and that they were always alone. He identified a photograph of himself taken at the time of the forensic interview.

A.B.2. testified that he attended the 2011 Christmas parade with his parents, that the Defendant and the Defendant's friends were at the parade, and that the Defendant asked A.B.2.'s parents for permission to take A.B.2 riding with the Defendant. A.B.2. said that he and the Defendant left the parade, that they rode around for a while, and that the Defendant stopped the car after they passed a graveyard. A.B.2. said that the Defendant asked if A.B.2. had "ever had or given a blow job." A.B.2. said that he told the Defendant no and that the Defendant asked if A.B.2. "wanted one or wanted to give one." A.B.2. said that although he declined, the Defendant attempted to perform oral sex on A.B.2., that A.B.2. "kneed him in the face and he drove off." A.B.2. said that after he declined, the Defendant asked, "Well why not, it's fun. It feels good." A.B.2. said that this was the last time he and the Defendant were alone together.

A.B.2. testified that the Defendant contacted him by telephone, text message, and, occasionally, Facebook message. A.B.2. said that the Defendant sent a photograph of the Defendant's penis and asked for a photograph of A.B.2.'s penis. A.B.2. said he declined.

On cross-examination, A.B.2. testified that he continued going riding with the Defendant because he was scared of the Defendant. A.B.2. said that the Defendant "was raping" him and that he feared the Defendant would "do something" to him. A.B.2. did not recall telling the forensic interviewer that there could have been other victims but that he had never seen the Defendant touch anyone else. A.B.2. said that the Defendant stated he "picked up boys from everywhere" and that most were teenagers.

On redirect examination, A.B.2. testified that the Defendant told him "what happens in the truck stays in the truck." A.B.2. said that he believed he could not tell anyone what occurred. He said that at the time of the incidents, he wore tight underwear and that the Defendant said A.B.2. "needed looser underwear" in order for the Defendant to "get his hand in there."

P.N. testified that he was age seventeen at the time of the trial and that he was born in September 1997. He said that his older brother introduced him to the Defendant. P.N. said that in June 2010, he and the Defendant spent time together. P.N. said that three weeks after he met the Defendant, the Defendant sent a text message to P.N.'s father asking if P.N. could go riding and stay overnight at the Defendant's home. P.N. said that the Defendant picked him up at home, that they picked up the four-wheeler at the Defendant's home, and that they went riding at "Nemo." P.N. said that they rode a four-wheeler to a swimming hole and that they went swimming. He said that he got out of the water, that the Defendant sat on a rock, that the Defendant said, "[L]ook at this," and that the Defendant had his penis exposed. P.N. said he looked away because he was "disgusted" and walked to the four-wheeler. He said that the Defendant removed all of his clothes and that the Defendant stated he could "change in front of anybody."

P.N. testified that as he and the Defendant returned to the Defendant's home on the four-wheeler, the Defendant "would like hump" P.N. He said that the Defendant stated he was "just playing around" when P.N. asked what the Defendant was doing. P.N. said that he and the Defendant ate pizza rolls after they arrived at the Defendant's home. P.N. recalled that they sat on the couch in the living room and that the Defendant "took his hand and put it over on" P.N.'s private area above his clothes. P.N. said that he asked the Defendant what he was doing and that the Defendant stated he was "just joking around." P.N. said that the told the Defendant to remove his hand and that the Defendant complied. P.N. said that they were alone in the home and that the Defendant stated his parents and brother were on vacation.

P.N. testified that he and the Defendant went into the Defendant's bedroom to go to sleep, that the Defendant turned on the television, and that they watched *Family Guy*. P.N. said that the Defendant displayed his penis and told P.N. to "look at this." P.N. recalled that he said, "[O]h, no, no, no, no," and that the Defendant placed P.N.'s hand on the Defendant's penis and asked if it felt good. P.N. said that he attempted to remove his hand but that the Defendant placed P.N.'s hand on the Defendant's penis again and began to move P.N.'s hand "up and down." P.N. said that the Defendant asked if it felt good, that P.N. told the Defendant it did not, that the Defendant turned off the television, and that they went to sleep. P.N. said that they slept in the Defendant's bedroom because the Defendant stated that the Defendant's brother's bedroom door was locked, that they could not enter the Defendant's parents' bedroom, and that the Defendant's parents did not like anyone sleeping on the couch. P.N. said that he wore black jogging pants and a t-shirt and that the Defendant wore boxer-brief underwear and a tank-top shirt.

P.N. testified that he awoke during the middle of the night, that the Defendant was "kind of balled up" against him, and that the Defendant had his mouth on P.N.'s penis. P.N. said that he pulled away from the Defendant and asked what the Defendant was doing and that the Defendant stated he "just wanted a lollipop. Just give me a lollipop." P.N. said that he pulled up his pants, that he shoved the Defendant to other side of the bed, and that he returned to sleep. P.N. recalled that this incident occurred around 3:00 a.m. because he saw a clock. P.N. said that he slept on his back, that he did not remove his pants, and that he did not want the Defendant to touch him.

P.N. testified that before the 3:00 a.m. incident, the Defendant, while naked, "got on top" of him and attempted to place the Defendant's penis inside P.N.'s mouth. P.N. said that he turned his head away and declined. P.N. said that the Defendant told him it would taste and feel good and that P.N. told the Defendant he did not want to do this. P.N. said that he pushed the Defendant away and that they went to sleep. P.N. recalled that the Defendant had an erection.

-9-

P.N. testified that the next morning, he and the Defendant ate breakfast before the Defendant drove him home. P.N. said that they never discussed the incidents and that he never returned to the Defendant's home, although the Defendant invited him multiple times. P.N. identified a photograph of himself taken at the time of the forensic interview.

On cross-examination, P.N. testified that he thought about calling his parents but that he feared the Defendant would "do something else" to him. P.N. agreed he did not tell anyone about the incidents for one and one-half years. P.N. denied he fabricated the incidents because he was angry at the Defendant for telling P.N.'s sister that P.N.'s then-girlfriend was cheating on P.N. P.N. denied he and the other victims fabricated the allegations against the Defendant. On redirect examination, P.N. testified that he did not believe the Defendant's allegations about P.N.'s then-girlfriend.

Morgan County Sheriff's Detective Samuel Hamby testified that he and Mr. Vittatoe investigated this case. Detective Hamby stated that the Defendant's date of birth was March 12, 1991.

T.V. testified for the defense that he attended school with P.N. and A.B.1. and that he graduated from high school one year before the trial. T.V. explained that "gobble, gobble" was a joke "we played in high school in . . . locker rooms and stuff." He said that "you just always walked up and reached down towards another guy's crotch and act like you were going to tickle them." He said that "gobble, gobble" also involved reaching over and hitting another person's crotch with your hand. He agreed there was physical contact with the person's private area. He said "gobble, gobble" was fairly common and that many boys did it at school. He said it was a joke and that he did not interpret it as an assault.

On cross-examination, T.V. testified that he and the Defendant went to the same school and grew up together, although the Defendant was a few years older. He said that "gobble, gobble" first started in school when he was age thirteen or fourteen. He said that everyone was about the same age but that he and the Defendant began "hanging out" more during T.V.'s senior year of high school. T.V. said that he and the Defendant did "gobble, gobble" to each other all the time. T.V. said that at this time, he had been age seventeen or eighteen and that the Defendant had been age twenty-three. When asked if "it might start getting a little creepy" if "gobble, gobble" were played between people who were further apart in age, T.V. said it depended on whether the person "was doing it back. That's what you got to find out."

The Defendant testified that he had known P.N. for several years, not several weeks as P.N. had stated. The Defendant denied that he and P.N. were at the Defendant's home alone in June 2010. The Defendant said he went to Texas for vacation in June 2010, although he was unsure of the date. He identified the airline ticket from the Texas vacation, which reflected a departure date of June 3, 2010, and a return date of June 11, 2010. He

said his parents and brother went to a recreational vehicle park at Center Hill when he went to Texas. He said that his family returned home before he returned from Texas. He said that at no time during the remainder of June was his family out of town. He denied that he and P.N. were ever alone at his home, although P.N. had been at his home. The Defendant denied that "anything strange" happened with P.N., that he attempted to touch P.N. in a sexual manner, that he attempted to have P.N. touch him in a sexual manner, and that he touched P.N. below P.N.'s clothes. The Defendant denied that he attempted to place his penis inside P.N.'s mouth. The Defendant said that after June 2010, he did not interact much with P.N. but that he spoke to P.N. when he saw P.N.

The Defendant testified that he had known A.B.2. for several years but that none of the events described by A.B.2. occurred. The Defendant said that he and A.B.2. went riding multiple times and that usually several other people joined them. The Defendant identified four people, including T.M. and K.M.[3], who were usually with the Defendant and A.B.2. The Defendant understood that A.B.2. and K.M. were part of a group of friends. The Defendant denied having ever touched A.B.2. inappropriately. The Defendant denied unzipping A.B.2.'s pants and touching A.B.2.'s private area. The Defendant denied having A.B.2. touch the Defendant's private area.

The Defendant testified that "gobble, gobble" was "just a joke" he learned in school. He admitted he had done "gobble, gobble" to the victims and said that the victims had done "gobble, gobble" to him. The Defendant said he never touched anyone below their clothes during "gobble, gobble" and denied that he did it for an extended period of time in which he grabbed and held anyone's private area. When asked if "gobble, gobble" involved a hit or "hand thing," the Defendant said, "It's about like a hit." He said that "gobble, gobble" was common in middle and high school, that it was not sexual, and that he never did it for sexual gratification.

Relative to testimony from A.B.1., B.B.1, T.M., and B.D. regarding the Defendant's touching, the Defendant denied having touched any of their genitals, having them touch the Defendant's genitals, having attempted oral sex on any of them, and having attempted to have them perform oral sex on the Defendant. The Defendant said that he did not think he had done anything wrong by playing "gobble, gobble" with them. He said that it was "a joke, like ah, ha, gotcha." He stated that nobody complained at the time. He said that some of them tried speaking to him after he was charged in this case but that he tried to stay away from them.

---

[3] The record reflects that the Defendant was charged with the sexual battery of K.M. and that the charge was dismissed on the day of the trial but before the trial began.

-11-

The Defendant testified that P.N.'s former girlfriend was the Defendant's cousin and that, at one time, she simultaneously dated P.N., T.M., and A.B.1. The Defendant admitted telling P.N.'s sister that P.N.'s girlfriend was cheating and said P.N.'s family was going to "make" P.N. end his relationship with her. The Defendant said that all of the allegations against him were made "right after that."

On cross-examination, the Defendant testified that the people who played "gobble, gobble" with him in school were his age. He agreed he played it with younger people. He said that he was age twenty-four at the time of the trial and that he was age twenty in March 2011. He agreed he had played "gobble, gobble" with each victim and said it was just a joke when asked if it were appropriate to play it with an eleven-year-old boy. When asked why he was "out with kids" who were as much as ten years younger, the Defendant said that he "just wanted to go out and do stuff so [he] . . . took anybody that wanted to go do anything [he] was doing." The Defendant disputed B.D.'s testimony that the Defendant picked up B.D. at 11:00 p.m. and that the Defendant contacted B.D.'s father. The Defendant said that he contacted B.D.'s mother.

The Defendant testified that he also went riding with friends who were his age. He denied that he told the victims that "what occurred in the truck stayed in the truck" and that this was something his grandfather said. The Defendant did not know the victims' ages. He agreed that he and P.N. had slept in the same bed. The Defendant agreed that P.N. could have slept on the couch and said that "[i]t didn't make a difference" where P.N. slept. The Defendant denied any sexual contact with P.N. The Defendant, likewise, denied any sexual contact with each victim. The Defendant agreed that he sent a text message to B.B.2.[4] stating the following:

> Hey man, sorry if I've said or done anything to make you mad. I've been having a hard time and turned to drinking and weed. And I went forward to the preacher, prayed to God to help me and I'm going to quit everything. And I just hope if I've done something to hurt you that you can forgive me.

The Defendant said that he apologized to B.B.2. because they had "been in some arguments" but that he did not recall the subject of the arguments. The Defendant denied he had sexually touched B.B.2. He did not dispute that the message was sent on January 12, 2013, after the victims' disclosures. The Defendant denied that his message was in response to a message he received from B.B.2. The Defendant recalled receiving a message from B.B.2. stating, "[H]ey man I got a problem. My mom is wanting me to tell the cops about you trying to jack me off." The Defendant denied, though, that his apology

---

[4] The record reflects that the Defendant was charged with the aggravated sexual battery of B.B.2. and that the charge was dismissed on the day of the trial but before the trial began.

-12-

was related to this. The Defendant later testified that he sent a message stating he did not know to what B.B.2. referred.

The Defendant testified that P.N. was angry with the Defendant about P.N.'s then-girlfriend, that P.N. and the other victims "got together and talked about what to do" in order to "help" P.N. When asked if he would have been embarrassed to talk about having sexual relations at age eleven, the Defendant said, "No, it was . . . a common thing, I mean. You start out young now." He agreed, though, that it would have been embarrassing to discuss having sexual relations with another boy.

Tammy King, the Defendant's mother, testified that in June 2010, the Defendant flew to Texas and that the remainder of the family went to Center Hill. Ms. King recalled that they returned home before the Defendant returned from Texas. She recalled picking up the Defendant at the airport. She said that other than the week everyone was away from home, she and her husband were home during June 2010. She said that nobody discussed with her the Defendant's acting inappropriately.

C.W. testified that he was age nineteen at the time of the trial, that he attended high school with P.N. and A.B.1., and that he had known the Defendant about two and one-half years. C.W. said that his brother had worked for the Defendant. C.W. said that the "gobble, gobble" game occurred in high school "[q]uite a bit" with boys and that it was "just like a game." He described the game as walking up to someone, touching the person's private area, and saying "gobble, gobble." C.W. said that although P.N. and A.B.1. never did "gobble, gobble" to him, he saw P.N. and A.B.1. do it to each other and to other boys.

C.W. testified that he had heard P.N. and A.B.1. discussing the present case at school. C.W. said that when he was in carpentry class at the vocational school, he overheard A.B.1. tell P.N. "it never actually happened." C.W. recalled that A.B.1. and P.N. were "kind of laughing about it."

On cross-examination, C.W. testified that during high school, he smoked marijuana "a little bit." He recalled smoking it three or four times per week and said he stopped smoking it the first semester of his senior year. C.W. said that P.N. and A.B.1. were only speaking to each other and that he heard A.B.1. say that A.B.1. was "forced" to make the allegations. C.W. said that A.B.1. did not state who forced him.

Upon this evidence, the jury convicted the Defendant of rape of P.N., attempted rape of P.N, aggravated sexual battery of B.B.1, aggravated sexual battery of B.D., sexual battery of A.B.1., sexual battery of A.B.2., and attempted statutory rape of T.M. The trial court imposed an effective twenty-five-year sentence at 100% service. However, at the motion for new trial hearing, the court reversed the Defendant's aggravated sexual battery and sexual battery convictions based upon trial counsel's failure to request a jury

-13-

instruction for the lesser included offense of assault by offensive or provocative contact. The court, likewise, reversed the conviction for the aggravated sexual battery of B.B.1. because the State failed to make an election of the offense. *See, e.g., State v. Qualls*, 482 S.W.3d 1, 9-10 (Tenn. 2016); *State v. Walton*, 958 S.W.2d 724, 727 (Tenn. 1997); *State v. Brown*, 762 S.W.2d 135, 137 (Tenn. 1988). The court ordered a new trial for the aggravated sexual battery and sexual battery convictions. The court denied the Defendant's request for a new trial for the rape of a child, attempted rape of a child, and attempted statutory rape convictions. This appeal followed.

## I.   Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his rape of a child and attempted rape of a child convictions, which involved P.N. He does not challenge the evidence supporting the attempted statutory rape conviction. He argues that P.N.'s testimony was inconsistent and that the State failed to establish P.N.'s age at the time of the offenses. The State responds that the evidence is sufficient.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

"Rape of a child is the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than three (3) years of age but less than thirteen (13) years of age." T.C.A. § 39-13-522. Sexual penetration is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, *however slight*, of any part of a person's body . . . into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required[.]" *Id.* § 39-13-501(7) (2010) (emphasis added).

Likewise, a defendant commits criminal attempt when he acts "with the kind of culpability otherwise required for the offense . . . [and] [a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part[.]" *Id.* § 39-12-101(a)(2).

## A.    Rape of a Child

In the light most favorable to the State, the evidence reflects that P.N. was born in September 1997. In June 2010, when P.N. was age twelve, the Defendant picked up P.N. at home, they obtained a four-wheeler at the Defendant's home, and they went riding at "Nemo." Afterward, P.N. and the Defendant returned to the Defendant's home. While P.N. and the Defendant sat on the living room couch, the Defendant "took his hand and put it over on" P.N.'s private area above P.N.'s clothes. P.N. told the Defendant to remove his hand, and the Defendant complied. P.N. stayed overnight at the Defendant's home, and they slept in the same bed. P.N. recalled that they watched *Family Guy* on television. Before P.N. fell asleep, the Defendant displayed his penis and placed P.N.'s hand on the Defendant's penis and asked P.N. if it felt good. Although P.N. removed his hand, the Defendant placed P.N.'s hand on the Defendant's penis again, moved P.N.'s hand up and down, and asked if it felt good. When P.N. said it did not feel good, the Defendant stopped, and they went to sleep. P.N. awoke around 3:00 a.m., at which time the Defendant was "kind of balled up" with his mouth on P.N.'s penis. P.N. pulled away from the Defendant and asked what the Defendant was doing. The Defendant replied that he "just wanted a lollipop." P.N. pulled up his pants, shoved the Defendant to other side of the bed, and returned to sleep. P.N. did not remove his pants and did not want the Defendant to touch him. We conclude that this evidence is sufficient to support the Defendant's conviction for rape of a child.

## B.    Attempted Rape of a Child

In the light most favorable to the State, the evidence reflects that before the 3:00 a.m. incident in the Defendant's bedroom, the Defendant, while naked, "got on top" of P.N. and attempted to place the Defendant's erect penis inside P.N.'s mouth. P.N. turned his head, declined, and told the Defendant he did not want to do this. The Defendant responded that it would taste and feel good. P.N. pushed the Defendant away, and they went to sleep. We conclude that the evidence supports the Defendant's attempted rape of a child conviction. He is not entitled to relief on this basis.

By concluding that the evidence is sufficient to support the Defendant's convictions for rape of a child and attempted rape of a child, we have not overlooked the Defendant's arguments that P.N.'s testimony was inconsistent, that P.N. never attempted to leave the home, and that P.N. reported the allegations more than one year after the incidents occurred. The Defendant, likewise, points to his and his mother's testimony that the only

time his parents were away from home in June 2010 was the same week the Defendant traveled to Texas. The jury, by its verdict, credited P.N.'s testimony, rejected the testimony of the Defendant and his mother that the Defendant and P.N. could not have been alone inside the Defendant's home in June 2010, and resolved any conflicts in the evidence in the State's favor. We will not reweigh the evidence on appeal. *See Bland*, 958 S.W.2d at 659; *Sheffield*, 676 S.W.2d at 547. The Defendant is not entitled to relief on this basis.

## II.     Ineffective Assistance of Counsel

The Defendant alleges multiple instances of ineffective assistance of trial counsel, including that counsel failed to litigate a motion to sever the charges, failed to advise him properly about the range of punishment for the offenses, failed to convey an eight-year plea offer, and failed to properly advise and prepare him for trial. The Defendant, likewise, argues that he is entitled to relief pursuant to the cumulative error doctrine. The State responds that the Defendant is not entitled to relief because trial counsel made informed, strategic decisions.

Typically, ineffective assistance of counsel claims are raised in a post-conviction case following the conclusion of the conviction proceedings. *See* T.C.A. §§ 40-30-101 to -122 (2018) (Post-Conviction Procedure Act). Occasionally, these claims are raised at the motion for new trial and in the appeal of the conviction proceedings, although this practice is "fraught with peril." *See State v. Anderson*, 835 S.W.2d 600, 607 (Tenn. Crim. App. 1992) (quoting *State v. Jimmy L. Sluder*, No. 1236, 1990 WL 26552, at *7 (Tenn. Crim. App. Mar. 14, 1990), *perm. app. denied* (Tenn. July 16, 1990)). In the present case, newly retained counsel raised the issue at the motion for a new trial, and the matter was fully litigated.

To establish that a defendant received the ineffective assistance of counsel in violation of the Sixth Amendment, a defendant has the burden of proving that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993). The Tennessee Supreme Court has applied the *Strickland* standard to an accused's right to counsel under article I, section 9 of the Tennessee Constitution. *See State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A defendant must satisfy both prongs of the *Strickland* test in order to prevail in an ineffective assistance of counsel claim. *Henley*, 960 S.W.2d at 580. "[F]ailure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). To establish the performance prong, a defendant must show that "the advice given, or the services rendered . . . are [not] within the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975); *see Strickland*, 466 U.S. at 690. The

-16-

trial court must determine if these acts or omissions, viewed in light of all of the circumstances, fell "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. A defendant "is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy by his counsel, and cannot criticize a sound, but unsuccessful, tactical decision." *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994); *see Pylant v. State*, 263 S.W.3d 854, 874 (Tenn. 2008). This deference, however, only applies "if the choices are informed . . . based upon adequate preparation." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). To establish the prejudice prong, a defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

A trial court's findings of fact relative to an ineffective assistance of counsel claim are binding on appeal, and this court must defer to them "unless the evidence in the record preponderates against those findings." *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997); *see Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A trial court's application of law to its factual findings is subject to a de novo standard of review without a presumption of correctness. *Fields*, 40 S.W.3d at 457-58.

At the motion for new trial hearing, the Defendant presented evidence related to his ineffective assistance of counsel allegations. Amy Rogers, the Defendant's sister, testified that she had an active role in her brother's defense and that she retained Daniel Forrester after the Defendant was questioned by the police. She said that she did not know the nature of the allegations at this time and that Mr. Forrester told her and the Defendant "to wait." She said that after the indictment was returned and the Defendant was arrested, she contacted Mr. Forrester and posted bond for the Defendant. She said that she provided Mr. Forrester with the indictment the day after the Defendant's arrest. She said that she and the Defendant met with Mr. Forrester multiple times after the Defendant's release and that she was present for all but two meetings. She said that Mr. Forrester never told the Defendant "what would happen" if the Defendant were convicted at a trial. She said that although Mr. Forrester discussed the charges in the indictment, he did not discuss the penalties.

Ms. Rogers testified that at the next meeting, she, the Defendant, and Mr. Forrester discussed "the evidence." She said that Mr. Forrester provided her and the Defendant with a binder of information, which included DVDs, that she and the Defendant reviewed the materials, and that they provided Mr. Forrester with their notes. She said that Mr. Forrester did not discuss the penalties for the charges at this meeting. She said that to her knowledge, the Defendant had not met with Mr. Forrester in her absence at this point during Mr. Forrester's representation.

-17-

Ms. Rogers testified that the Defendant's entire family attended the next meeting with Mr. Forrester and that they discussed the evidence and what the family thought was "wrong with each charge." She said that Mr. Forrester did not discuss the felony classification or possible sentence of each offense. She agreed that she attended various court appearances during this time period. She said that Mr. Forrester did not have private meetings with the Defendant during this time and that she was present for each meeting and court appearance. She said that Mr. Forrester never asked her to step out of a meeting in order for Mr. Forrester to meet privately with the Defendant.

Ms. Rogers testified that at the next meeting at Mr. Forrester's office, she and the Defendant met Mr. Cohen, a private investigator. She said that they talked about "pursuing trial and getting ready for trial" and that Mr. Forrester scheduled the Defendant to undergo a polygraph examination. She said that at this meeting, Mr. Forrester and Mr. Cohen spoke privately with the Defendant for about twenty minutes. She said this was the first meeting at which she was not present. She said that as she, her mother, and the Defendant were leaving Mr. Forrester's office, she asked Mr. Forrester about the "worst case scenario." She said that at this time, everyone thought the case "was going to [be] washed away, just wash it away" and that Mr. Forrester responded the Defendant faced a twelve-year sentence. She said that Mr. Forrester did not mention a service requirement or whether the Defendant was eligible for an alternative sentence.

Ms. Rogers testified that the Defendant underwent the polygraph examination at the next meeting with Mr. Forrester. She said that this was the only meeting she did not attend but that her mother was present.

Ms. Rogers testified that in 2014, an issue arose in connection with the Defendant's bond and that she and the Defendant met with Mr. Forrester. She said that Mr. Forrester did not explain the consequences of being convicted of the charged offenses and the elements of the offenses. She said they only reviewed the "bond revoke." She said that afterward, they went to the courthouse for the revocation hearing, at which time she and the Defendant met attorney Mart Cizek. She said that the Defendant's bond was not revoked at this time but was later revoked and that he remained in jail for approximately one to two years before the trial.

Ms. Rogers identified a June 10, 2014 letter from Deputy District Attorney General Frank A. Harvey which was addressed to Mr. Forrester and stated the following:

> You had asked about an offer at some point in this case so I thought I would start a dialog. We would be agreeable to dropping the child rape cases to rape, agree to a minimum sentence on all counts, all concurrent for a total of effective sentence of eight (8) years to be served in accordance with the statute.

Please kick this around with your client and get back with myself or Tiffany to discuss any details or possible "tweaking."

Ms. Rogers stated that she never saw this letter or was informed of the letter's contents before the trial. She said that she first learned of the letter when she met with post-trial attorney Robert Kurtz. She said that she never heard Mr. Forrester or Mr. Cizek tell the Defendant about the eight-year offer. Ms. Rogers said that the Defendant's bond had not yet been revoked at the time the eight-year offer had been extended by the prosecutor.

Ms. Rogers identified a September 30, 2014 letter from General Harvey. The letter was addressed to Mr. Forrester and to Mr. Cizek and stated the following:

I know earlier we had an offer on the table for Mr. King's consideration, but given the fact that he has to date declined that offer and in light of the more recent developments in the case, including the investigation into an allegation of a new assault, we are taking that offer off of the table. We will still be willing to negotiate on this case and we are not saying that this offer won't be put on the table again, just that we all need to step back for a bit and reassess the situation.

Please let us know if you have any questions.

Ms. Rogers stated that the Defendant was in jail on September 30, 2014. She said that she had never seen the letter and that Mr. Forrester and Mr. Cizek did not tell her that the State had withdrawn a plea offer.

Ms. Rogers testified that after the Defendant's bond was revoked, the Defendant began telling her that he had not had any communication with Mr. Forrester. Ms. Rogers said that she called and sent text messages to Mr. Forrester but that she never spoke with Mr. Forrester while the Defendant was in pretrial confinement.

Ms. Rogers testified that the next event in the case was the trial and that she retained new counsel for the Defendant before the sentencing hearing. She said that she met with Mr. Kurtz and that he explained for the first time the Defendant's possible sentencing outcomes and the possibility of consecutive service. She said that until her meeting with Mr. Kurtz, "we" thought the sentence "could have" been twelve years. She said Mr. Kurtz explained that the Defendant faced a possible seventy-five to seventy-nine-year sentence.

Ms. Rogers testified that to her knowledge, Mr. Forrester did not hold additional pretrial meetings at his office. She was unaware of whether Mr. Forrester met with the Defendant at the jail. She said that she did not meet with Mr. Forrester and the Defendant at the jail.

On cross-examination, Ms. Rogers testified that the Defendant was in pretrial confinement from September 2014 to June 2015. She did not know if Mr. Forrester and Mr. Cizek met with the Defendant during this time.

Ms. Rogers identified a letter she sent to the trial judge, which was entered into the trial court record on December 29, 2014. She agreed that in the letter she expressed concern for the Defendant, that Christmas was approaching, and that the Defendant's case had been difficult for her and the Defendant's mother. Ms. Rogers, likewise, agreed she told the judge that there was no evidence to support the charges, that she was concerned the trial would occur in Morgan County, that the Defendant had been assaulted, and that the police report had been lost. She agreed that she did not state in the letter Mr. Forrester was not working on the Defendant's case.

The Defendant testified that he learned of the allegations in early 2012, that he spoke to his family about the investigation, and that he retained Mr. Forrester. The Defendant said he understood that if he were arrested, Mr. Forrester would secure his release from jail and "proceed in my trial hearing." The Defendant said that Mr. Forrester did not speak with the police, anyone in the district attorney's office, and any witnesses before the Defendant was charged. The Defendant said he did not meet with Mr. Forrester to discuss the allegations and witnesses before the return of the indictment.

The Defendant testified that a few days after his arrest, he and Ms. Rogers met with Mr. Forrester. The Defendant said that he did not meet privately with Mr. Forrester and that his sister was present for the entire meeting. The Defendant said that they reviewed the indictment but did not discuss "a whole lot of details on it." He denied that Mr. Forrester explained at any meeting the charges, the elements of the offenses, the possible sentences, the sexual offender registry, and community supervision for life. The Defendant said that Mr. Forrester discussed a sentence of twelve to fifteen years.

The Defendant testified that he attended five or six meetings at Mr. Forrester's office and that the only private meeting was with Mr. Forrester and a private investigator. The Defendant said that to his knowledge, the investigator did not speak with any witnesses and to the investigating police officers. The Defendant said that his only private meeting with Mr. Forrester and the investigator lasted approximately twenty minutes and that they only discussed the Defendant's "background." The Defendant stated that he attended the polygraph examination at Mr. Forrester's office without his family. The Defendant said, though, that he and Mr. Forrester did not meet privately to discuss the case.

The Defendant testified that while he was released on bond, he spoke with Mr. Forrester at the few scheduled court appearances before the trial. The Defendant said that he did not meet privately with Mr. Forrester during any of the court appearances. The

-20-

Defendant said that, at the court appearances, Mr. Forrester did not discuss the sentencing ranges for the offenses, the sexual offender registry, and community supervision for life.

The Defendant testified that he had been in police custody since September 17, 2014, and that he remained in custody for nine months before the June 2015 trial. The Defendant stated that during those nine months, Mr. Forrester met with him once at the jail and that this meeting occurred the day before the trial. The Defendant said that Mr. Cizek and Mr. Varsalona, a member of the defense team, did not visit him at the jail. The Defendant said that he did not receive any mail or telephone calls from his trial attorneys and that his only communication with any of his attorneys was with Mr. Forrester on the day before the trial. The Defendant said that at this thirty-minute meeting, Mr. Forrester did not have the case file or a laptop and did not discuss the State's anticipated proof, the defense theory, and whether the Defendant should testify. The Defendant stated that Mr. Forrester did not discuss his right to remain silent and did not provide advice about whether he should testify. The Defendant said that Mr. Forrester did not ask if he wanted to testify, did not discuss the questions Mr. Forrester and the prosecutor might ask, and did not discuss the advantages and disadvantages of testifying.

The Defendant reviewed the June 10, 2014 plea offer letter and testified that he did not see the letter until after his trial had concluded. The Defendant said Mr. Forrester did not inform him that an offer had been extended by the State and that the offer had been eight years. The Defendant said that Mr. Forrester knew how to contact him when he was released on bond and that Mr. Forrester notified him that he had to appear in court for the bond revocation hearing. The Defendant said that Mr. Forrester did not inform him that the offer remained pending until September 30, 2014, and that Mr. Forrester did not inform him the offer was withdrawn. The Defendant said that during his pretrial confinement, he requested his sister contact Mr. Forrester to inquire about a possible plea agreement but that she was unable to reach Mr. Forrester. The Defendant said that Mr. Forrester never discussed any efforts to negotiate a plea agreement.

The Defendant testified that Mr. Forrester never stated he faced a mandatory twenty-five-year sentence. The Defendant said that after the trial proof but before the return of the verdicts, he asked Mr. Forrester about the "worst case scenario" and that Mr. Forrester responded that "if [worse] comes to worse we have a reasonable judge and no more than 20 convict of all." The Defendant said that post-trial attorney Richard Gaines was the first person to inform him that he faced a minimum mandatory sentence of twenty-five years. The Defendant said that if he had known of the mandatory twenty-five-year sentence in June 2014 and of the eight-year plea offer, he would have accepted the State's offer.

On cross-examination, the Defendant testified that Mr. Forrester knew about the "gobble, gobble" game because he and his family made notes as they reviewed the discovery materials and provided the notes to Mr. Forrester. He said he was unaware of

the State's efforts to revoke his bond as early as December 2013. He identified a December 9, 2014 letter he wrote to the trial judge requesting that the judge reinstate his bond. The letter stated that he had misunderstood the court's orders and that he had not known he could not use Facebook, which was the reason for the revocation. He said that he thought he was prohibited from having contact with minors, not that he could not communicate with adults on Facebook. He agreed that the letter stated he had been working with Mr. Forrester "to abide by all your rules and have tried to do everything right." He agreed that he did not complain about Mr. Forrester in the letter.

The Defendant identified a December 19, 2014 letter he wrote to the trial judge. The Defendant agreed that his second letter repeated the same topics and that he did not state in the letter he had not communicated with his attorneys.

On redirect examination, the Defendant clarified that in the first letter to the trial judge, he had referred to working with his attorney to comply with the terms of his release before his bond had been revoked. The Defendant said that between September 17 and December 9, Mr. Forrester had not contacted him at the jail. The Defendant said that he had not attended college, had not been trained in the law, and had not had legal problems before this case. He said that he did not have experience with the criminal justice system and that he was unaware Mr. Forrester was not providing him with necessary information.

Daniel Forrester testified that he had practiced criminal and domestic law for approximately fourteen years. He said that the Defendant's sister contacted him about potential criminal charges in Morgan County. Mr. Forrester said that the Defendant's family paid a small fee and that he spoke with the Defendant and his family about whom they thought were making allegations against the Defendant, the Defendant's relationship with the potential victims, and the nature of the allegations. Mr. Forrester recalled that the Defendant and his sister discussed the "gobble, gobble" game and that, based on their discussion, Mr. Forrester thought the potential charges might have been some form of sexual battery. Mr. Forrester said that rape of a child was not an issue at this juncture. Mr. Forrester said the Defendant was charged shortly after their meeting.

Mr. Forrester testified that after the indictment was returned, he was "sure" he told the Defendant that he had been charged with two Class A felonies and that the sentencing range was fifteen to twenty-five years. Mr. Forrester said Mr. Cizek spoke to the Defendant, as well, relative to the sentencing range. Mr. Forrester said that he met with the Defendant and his family numerous times and that he knew "it's come up in conversation." Mr. Forrester stated that he met with the Defendant "a couple of times" at the jail and that as a general rule, "we would have" discussed the sentencing range for a Class A felony. He said he "would imagine at a minimum" that he told the Defendant he was charged with Class A felonies "from day one." Mr. Forrester did not recall if he advised the Defendant that rape of a child required a twenty-five-year sentence but said

"[w]e would have told him it was mandatory to serve." Mr. Forrester said that although he did not have any notes, "[a]t some point, I've had the conversation with Mr. King you're looking at a lot of time." When asked if he advised the Defendant about community supervision for life and the sexual offender registry, Mr. Forrester said that he was "sure in the conversations with family that's one of the basic things of any charge like that."

Mr. Forrester testified that he did not recall the number of times he met with the Defendant but that it was more than a few times. Mr. Forrester said that the Defendant was "sort of the person no news is good news" and that he spoke with the Defendant's sister more than the Defendant. Mr. Forrester said that he met with the Defendant "some" after the Defendant's bond was revoked. Mr. Forrester said that he received the initial eight-year offer but that the Defendant's "family specially was very adamant that Mr. King was not guilty and they were not going to entertain a guilty plea." When asked if the family was not going to entertain any offer, Mr. Forrester said, "Not at that time and not especially to eight years." Mr. Forrester said that the Defendant never said he wanted to negotiate. Mr. Forrester said that his "impression" was that the Defendant "might have been amenable but that the family was very adamant. And I think pulled some sway over Mr. King as well as just he is not guilty and he's not taking a plea." When asked if he discussed the offer with the Defendant alone, Mr. Forrester said the following:

> I don't – we've talked to him yes, not particularly and it's because of how this case went. At first they had offered the eight years and we still have – and again I still think even if we had pulled him aside to talk to him they would not have – I don't know if the family – I don't think he would have, at that time, taken any plea.
>
> But then afterward your office, either you or Mr. Harvey, . . . revoked the offer and at that point all offers were off the table. And I know at one point we tried to speak with Mr. Harvey, myself and Mr. Cizek, and I think also we talked with yourself . . . about it and was informed there would be no plea negotiations; you're just going to try the case.

Mr. Forrester testified that he filed motions, including a motion to sever the offenses. He said that he appeared in court a couple of times after the severance motion was filed, that the motion hearing "might have" been scheduled, and that "for whatever reason, and again I don't recall exactly we just didn't hear the severance issue." When asked if he had a strategic reason for not pursuing a severance, Mr. Forrester recalled that he and Mr. Cizek "had brief discussions" about it. Mr. Forrester said, though, that he did not recall if they "ever had [a] definitive reason, but at some point we had it set for trial and we prepared and tried it as a group just as – with the individuals."

-23-

Mr. Forrester testified that A.F., P.N.'s former girlfriend, was another victim and that the Defendant's family believed A.F. was the "root cause" of the charges.[5]  Mr. Forrester said that the Defendant informed P.N. that A.F. was dating another boy, that A.F. learned about the Defendant's telling P.N., and that A.F. threatened to "get back at" the Defendant.  Mr. Forrester said that the group of boys conspired to get the Defendant in trouble.  Mr. Forrester said that he brought out this theory through cross-examination of the witnesses.  He agreed the indictment count alleging misconduct against A.F. was dismissed before the trial but said he could not recall if the dismissal was based upon an agreement with the State.

Mr. Forrester identified a June 17, 2013 letter he sent to General Harvey.  The letter stated, in relevant part, that Mr. Forrester had enclosed a copy of a motion to sever the offenses filed with the trial court.[6]  The letter, likewise, stated that Mr. Forrester learned of a possible rumor that two victims had recanted their stories to the Morgan County Sheriff's Office and that the victims were told to "wait until Court."  Mr. Forrester recalled learning later that two victims had not recanted.

Mr. Forrester identified a December 18, 2013 letter he received from Deputy District Attorney Harvey in response to Mr. Forrester's June 2013 letter.  The letter reflects that they needed to schedule the motion to sever for a hearing but that the State's position was that "enough similarity between some or all of these counts that they should and rightly can be tried together or at least some of them can and should."  The letter, likewise, stated that although the State had been unable to substantiate the reported recantation by two victims, Detective Hamby was investigating the matter.  The letter stated that a motion to revoke bond was enclosed.  Mr. Forrester testified that the State sought to revoke the Defendant's bond twice, that the December 2013 motion was resolved by an agreement, and that the Defendant's bond was not revoked until later.

Mr. Forrester testified that regarding trial strategy, he spoke to the Defendant and his family about it and that revenge was the chosen theory.  When asked if severance of the offenses would have complicated the chosen theory, Mr. Forrester said that "there might be issues trying to bring some of that up because there's allegations you wouldn't want to introduce at trial.  But there's also advantages . . . to severing it as well."

Mr. Forrester testified that with the Defendant's family's consent, he asked Mr. Cizek to join the defense.  Mr. Forrester said that Mr. Varsalona had minimal involvement

---

[5] The record reflects that the Defendant was charged with the sexual battery of A.F. and that the charge was dismissed on the day of the trial but before the trial began.

[6]  The letter likewise states that the Defendant had passed the polygraph examination, the results of which were enclosed with the letter.

in this case. Mr. Forrester said that he and Mr. Cizek discussed the case "off and on." When told that previous testimony reflected that the Defendant believed, based upon Mr. Forrester's statements, that the Defendant faced a maximum sentence of twelve years, Mr. Forrester said,

> No, the only thing . . . I've thought about that just from being asked by counsel here today, initially, before he was charged, we thought he was looking at a B felony, which would have been eight to twelve. . . . That's the . . . only thing I can think of offhand where that would have came from.

Mr. Forrester said that he was "sure" he would have "immediately said whoa, you've got two A felonies, this is not B felony territory, . . . you have mandatory sentence territory." He said that the Class A felonies increased the amount of the retainer fee.

On cross-examination, Mr. Forrester testified that he knew he told the Defendant that any sentence was "mandatory to serve." Mr. Forrester stated,

> [W]hether I said it was the 25, I know I told them 15 to – I have no doubt just because of habit I would have spewed out 15 to 25 just as I did this morning. I don't know . . . that I said specifically 25 years but I do know we told him it was mandatory to serve.

Mr. Forrester agreed that rape of a child required a minimum sentence of twenty-five years. Mr. Forrester said that he was "fairly certain" he discussed community supervision for life with the Defendant's family and "probably" with the Defendant. Mr. Forrester said he was "sure" he told the Defendant about the sexual offender registry but also said he was uncertain. He said that he "like[d] to think we" calculated the Defendant's maximum possible sentence for each charge. Mr. Forrester said that he did not memorialize in writing his conversations with the Defendant and the Defendant's family. When asked if he advised the Defendant about the sentencing range for aggravated sexual battery, Mr. Forrester said, "Well, if it's a B felony, eight to twelve" at 30% service for a Range I offender.

Mr. Forrester testified that although he spoke to Detective Hamby, he could not recall whether the conversation occurred before or after the return of the indictment. Mr. Forrester did not recall speaking to anyone in the district attorney's office before the indictment was returned. Mr. Forrester did not recall an exact number but said he met with the Defendant and the Defendant's family "quite a few" times. He recalled, though, that Ms. Rogers was the "spear head of the family" and that "we" talked to Ms. Rogers "more . . . than anyone else." Mr. Forrester agreed that he only met privately with the Defendant twice, which included the day of the polygraph examination and when Mr. Forrester

"debriefed" the Defendant. Mr. Forrester said that the Defendant and the Defendant's family were always present at meetings held at the courthouse.

Mr. Forrester testified that the Defendant's case was the first in which a client had been charged with rape of a child. He agreed he filed six motions before the trial, which included requests for a bill of particulars, severance, and waiver of the jury setting the fine. He said that some of the motions required an evidentiary hearing and that he met with the Defendant and the Defendant's family at "status update" appearances and at the bond revocation hearings.

Mr. Forrester testified that in June 2014, he received the plea offer letter from the district attorney's office. He agreed that he initiated the discussion about a possible plea offer with the prosecutor at the "behest" of the Defendant. When asked if the Defendant had been amenable to a plea agreement, Mr. Forrester said that the Defendant's family was adamant the Defendant was not guilty. Mr. Forrester said that his "impression . . . from the family was that unless [Mr. Forrester] got [the Defendant] such a good deal that [the Defendant] just couldn't pass it up, [Mr. Forrester was] not sure they would – [the Defendant] would have taken any deal." When asked if he discussed the plea offer with the Defendant, Mr. Forrester stated, "I didn't ever give him the yes or no verbatim are you going to take the deal or not. I generally will try to always talk to the D.A. and explore my options, even if my client is going to just try the case." Mr. Forrester said, "If we – I'm sure we told him." Mr. Forrester stated that he recalled discussing the offer with the Defendant and that the discussion "probably would have" occurred at his office. When pressed about whether Mr. Forrester had a distinct memory of discussing the offer, he said, "No, I'm saying that I'm sure it was brought up and I'm sure it was not extensively discussed because again [the Defendant] was not guilty and was not – and I don't know if that's changed but they're very – him and his family always have this he's not guilty." Mr. Forrester said that he did not counsel the Defendant privately that the decision to accept or reject an offer belonged to the Defendant.

Mr. Forrester testified that after the Defendant's bond was revoked in September 2014, the Defendant remained in jail until the trial. Mr. Forrester said he met with the Defendant two or three times at the jail. Mr. Forrester reviewed the jail visitation records and a letter from Roane County Sheriff Captain Emmert regarding "other visitation" during the Defendant's confinement. Mr. Forrester agreed that his name did not appear in any visitation record. He was unsure if he was required to schedule an appointment to meet with the Defendant at the Roane County jail but said he met with the Defendant at the jail. Mr. Forrester reviewed the Roane County jail mail log during the time of the Defendant's confinement and agreed the records did not reflect any correspondence from him to the Defendant during the nine months the Defendant was confined at the jail. Mr. Forrester agreed that he did not send any correspondence to the Defendant during this time. Mr. Forrester stated that he met with the Defendant at the jail one or two days before the trial

and that he did not recall whether he brought any materials to the meeting.  He thought Mr. Cizek might have been at the meeting.

Mr. Forrester testified that he did not recall any agreement with the State regarding the motion to sever.  He denied that the indictment count involving A.F. was dismissed in exchange for not pursuing the motion to sever.  When asked why he did not litigate the motion to sever, Mr. Forrester said he could not recall.  He said that although he researched the issue at the time he filed the motion to sever, he did not recall the standard and that he had "not touched another child rape case since" this case.  Mr. Forrester said that he had purposely not taken any child rape cases because he was "sick for days afterward" and that "it was just not a pleasant experience."  Mr. Forrester reviewed Tennessee Criminal Procedure Rule 14 regarding severance and testified that although reviewing the Rule "somewhat" refreshed his recollection, he did not recall any of the factors to be considered when seeking a severance.

Mr. Forrester reviewed the September 2014 letter from the district attorney's office revoking the eight-year plea offer and said that he later explored additional plea negotiations but that the prosecutor would not extend an offer.  Mr. Forrester reviewed the prosecutor's December 2013 letter acknowledging, in relevant part, the motion to sever and arguing that at least some of the indictment counts should be tried together.

Mr. Forrester testified that there was a discussion about lesser included offenses after the State's proof but that Mr. Cizek was more knowledgeable of this discussion.  Mr. Forrester recalled, though, that the trial judge was frustrated and angry during the discussion because the judge had already prepared the preliminary jury instructions, which needed to be modified after the prosecutor and the defense discussed lesser included offenses.  Mr. Forrester agreed that the defense did not file a written request for lesser included offenses.

Mart Cizek testified that Mr. Forrester contacted him about this case and asked him to assist when the case "got closer to trial."  Mr. Cizek said that he assisted with "trial practice," voir dire, and cross-examination of the State's trial witnesses.  He said, though, that his focus was jury selection.  He did not recall how the "issue of multiple victims" was addressed in trial strategy.  He recalled, though, a "round about discussion" that the victims had "started to gang up" on the Defendant and said the Defendant's friends and "some of" the victims had fought at school.  Mr. Cizek recalled that the charge involving A.F. was dismissed before the trial.

Mr. Cizek testified that initially the discussions regarding jury instructions were held off the record but that the parties agreed "something" was missing from the final instructions.  He was uncertain but thought the missing instruction was related to assault by offensive or provocative contact as a lesser included offense.  He recalled that the trial

judge was "visibly upset" and said that the defense told the trial court the defense "would not require that part of the jury instruction." He was uncertain if including assault as a lesser included offense would have impacted the jury's verdicts.

Mr. Cizek testified that he was not involved in the discussions regarding the motion to sever. He said that he did not meet privately with the Defendant and that he recalled meeting with the Defendant once at Mr. Forrester's office and at the courthouse for the bond revocation hearing. Mr. Cizek recalled that at the first meeting, he introduced himself and discussed his role at the trial. Mr. Cizek said that he did not discuss the Defendant's possible sentence and that his role was related to trial issues.

On cross-examination, Mr. Cizek testified that he did not recall discussing with the Defendant the possible sentence, the consequences of losing at a trial, the sexual offender registry, and community supervision for life. He said that if he did have those discussions, it would have been in the presence of Mr. Forrester, who was lead counsel, but that the Defendant was Mr. Forrester's client. Mr. Cizek said that Mr. Forrester had "any direct dealings" with the Defendant and that Mr. Cizek "did not have anything outside." Mr. Cizek said that Mr. Forrester communicated with the Defendant and the Defendant's family and that Mr. Cizek prepared for trial.

Mr. Cizek testified that after the trial evidence was presented, someone who worked for the trial judge prepared the final jury instructions. He recalled that the jury charge conference occurred in the judge's chambers and that the parties agreed to the charge at the conclusion of the conference. Mr. Cizek said, though, that after the parties returned to the courtroom, there "was a problem" with the judge because the charge needed to be modified. Mr. Cizek did not recall whether the issue was the omission of assault as a lesser included offense. He said that if the transcript reflected that he told the judge he did not want to include assault as a lesser included offense for any of the charged offenses, he would not dispute it.

Mr. Cizek testified that he did not have a "specific active role" in the plea negotiations but that he recalled a telephone conference call he and Mr. Forrester had with the prosecutor. Mr. Cizek reviewed the letter extending the eight-year plea offer and said that although the letter was not addressed to him, he had seen it. He reviewed the letter withdrawing the offer and stated that the letter was addressed to him and to Mr. Forrester. Mr. Cizek believed the conference call with the prosecutor occurred between June 10, 2014, and September 30, 2014, the dates of the letters. He did not recall discussing the offer with the Defendant and said that, based upon his role in the case, Mr. Forrester would have been the person who spoke to the Defendant about the offer. Mr. Cizek did not recall further plea negotiations after the eight-year offer was withdrawn. He said that he did not meet with the Defendant at the jail.

Mr. Cizek testified that he and Mr. Forrester did not discuss severing the charges. Mr. Cizek agreed that the trial strategy was that the basis for the aggravated sexual battery and sexual battery charges was the "gobble, gobble" game, that the game was not played for sexual gratification, and that the remaining allegations were "outright lies."

On redirect examination, the portion of the trial transcript addressing the final jury instructions was read to Mr. Cizek. Mr. Cizek agreed that the trial judge stated, "And we decided assault would probably not fit into these as a lesser included offense." Mr. Cizek agreed the transcript reflected that the prosecutor "left it to the defense to see if they want to charge assault" and that Mr. Cizek responded, "We do not request it." Mr. Cizek recalled that he and the prosecutor had a discussion outside the judge's presence about assault.

Mr. Cizek testified that many of the events occurred around riding some type of vehicle on Gobe and that the exception was the events surrounding the rape of a child allegations by P.N., which occurred at the Defendant's parents' home. Mr. Cizek said that generally, the victims went with the Defendant to ride a four-wheeler in the woods. Mr. Cizek stated, though, that he distinguished the "gobble, gobble" game as horseplay from the rape allegations, which were false. When asked about his impression about whether the Defendant and his family wanted to pursue plea negotiations as the case approached trial, Mr. Cizek said that he did not have "interaction for the most part" with the Defendant and the Defendant's family and that he relied upon Mr. Forrester's assertion that the Defendant and the Defendant's family were "firmly entrenched in the belief that [the Defendant] was not going to plea to anything."

On July 24, 2019, the trial court entered a written order granting in part and denying in part the motion for a new trial. The trial court found that after the return of the indictment, Mr. Forrester met with the Defendant to discuss each charge in the indictment, that Mr. Forrester met with the Defendant "and/or" the Defendant's family on several occasions before the trial, and that Mr. Forrester reviewed the discovery materials with the Defendant and the Defendant's family. The court found that Mr. Forrester hired a private investigator, had the Defendant undergo a polygraph examination, and had the Defendant evaluated to determine his mental capacity at time of the incidents and to determine

whether the Defendant was competent to stand trial.[7]  The court found that on June 10, 2014, Mr. Forrester sought and received an eight-year plea offer from the State, that Mr. Forrester discussed the offer with the Defendant and the Defendant's family, and that the Defendant and his family were adamant that the Defendant was not guilty and would not plead guilty.  The court found that after the Defendant's bond was revoked on September 15, 2014, the Defendant remained in confinement from September 17, 2014, to the June 2015 trial.  The court found that on September 30, 2014, the eight-year plea offer was revoked and that the letter revoking the offer stated that the Defendant had "to date declined [the] offer."  The court found that Mr. Forrester and Mr. Cizek's efforts to obtain a plea agreement later were unsuccessful.

The trial court found that Mr. Forrester filed a motion to server the offenses and that although Mr. Forrester could not recall the reason he did not litigate the motion, he conducted research concerning the "possible legal issues," advised the Defendant of the charges, the possible punishments if convicted at a trial, investigated whether any of the victims recanted their allegations, and inquired about DNA evidence.

The trial court found that although the Defendant was sentenced on October 13, 2015, and the initial motion for new trial was filed on November 12, 2015, the motion for new trial hearing was not held until February 25, 2019, after the filing of two amended motions.  The court found that "no explanation had been provided" relative to the three-year delay, which put Mr. Forrester and Mr. Cizek "in a very difficult situation where they have been asked to recall with specificity conversations they had with the defendant and decisions they made during the course of representing the defendant[.]"  The trial court determined that Mr. Forrester was "honest" and "simply didn't recall with absolute certainty the conversations he had with the defendant and why certain decisions were made[.]"

The trial court determined that the Defendant was not credible "when he claimed he was not aware of the State's plea offer."  The court found that Mr. Forrester and Mr. Cizek testified that the Defendant's "family was adamant that the defendant was innocent and would not plead guilty to anything."  The court found that after the Defendant's bond was

---

[7] Although not addressed at the motion for new trial hearing, the record reflects that on June 17, 2014, the trial court entered an order directing Ridgeview Psychiatric Hospital & Center, Inc. to evaluate the Defendant's mental capacity at the time of the offenses, competency to stand trial, and capability of understanding the nature of his conduct.  The July 23, 2014 evaluation report reflects that the Defendant had "sufficient present ability" to consult with his attorney "with a reasonable degree of rational understanding" and a "factual understanding of the proceedings against him."  The report states, "In order to maintain his competence, it may be necessary for [the Defendant] to comply with any prescribed psychiatric treatment," noting the Defendant's "documented history of mental illness."  The report reflects that that the Defendant appreciated the nature or wrongfulness of the alleged offenses and that the Defendant's IQ was 95.

revoked, he wrote two letters to the trial judge addressing the bond revocation and that neither letter complained about his attorneys.

The trial court found that Mr. Forrester reviewed the charges and possible sentences with the Defendant and the Defendant's family. The court found that although Mr. Forrester could not recall specifically if he advised the Defendant of the mandatory twenty-five-year sentence "for the Class A felony charges," Mr. Forrester told the Defendant the sentence was "mandatory to serve." The court determined that Mr. Forrester was unable to "specifically state the conversations he had . . . regarding the maximum punishments" because of the passage of time. The court discredited the Defendant "on this allegation." The court stated that it was "unwilling [to] find that trial counsel was ineffective due to his inability to remember conversations he had with the defendant almost six years ago."

The trial court found, relative to the eight-year plea offer, that Mr. Forrester testified that he reviewed the plea offer with the Defendant and that Mr. Forrester and Mr. Cizek testified that "the defendant's family was adamant that the defendant was innocent and . . . would not plead guilty to anything." The court noted that the letter withdrawing the offer stated that the offer "had been declined." The court determined that the Defendant was "merely having second thoughts about not accepting the plea offer and wants another bite at the apple." The court determined that counsel did not provide deficient performance resulting in prejudice.

The trial court found that Mr. Forrester properly advised the Defendant about whether to proceed to a trial, trial strategy, possible defenses, and the decision to testify. The court found that without having discussed the case with the Defendant, trial counsel would not have known about "gobble, gobble," the alleged conspiracy by the victims, and whom to present as defense witnesses. The court discredited the Defendant's testimony regarding this allegation and determined that counsel did not provide ineffective assistance.

The trial court found that on December 18, 2013, Mr. Forrester filed a motion to sever the offense but that he did not "bring the motion" before the court for an evidentiary hearing. The court found that the December 18, 2013 letter from the prosecutor reflected the State's position that "enough similarity between some or all of the counts" supported trying at least some of the counts together. The court found that at the time the motion was filed, the indictment contained ten counts involving nine victims, all but one of whom were male. The court found that before the trial, three counts were dismissed, including the count involving the female. The court determined that Mr. Forrester could not recall why the counts were dismissed and whether the dismissals were in response to the motion to sever. The court found that Mr. Forrester could not recall why the motion to sever was not litigated but that "it could very well have been a tactical choice." The court recounted the defense theory that the "gobble, gobble" game was not sexual and that the rape allegations were false and the result of a conspiracy. The court determined that it would not second

-31-

guess counsel's strategic, tactical choices in connection with the motion to sever. The court, likewise, found that Mr. Forrester performed research before filing the motion, "tend[ing] to prove that the decision to file the motion to sever was based on informed preparation," and testified that severing charges had advantages and disadvantages. The court determined that "in the absence of evidence ruling out the possibility of a tactical reason to explain trial counsel's conduct, the presumption of competence remains unrebutted and operates to preclude a finding of ineffective assistance." The court determined that counsel did not provide ineffective assistance.

The trial court determined that trial counsel provided ineffective assistance for failing to request a jury instruction for assault by offensive or provocative contact as a lesser included offense of aggravated sexual battery and sexual battery. The court found that the jury was not provided with an instruction for any lesser included offenses and determined that an instruction for assault by offensive or provocative contact as a lesser included offense was warranted because the defense evidence showed that the Defendant's contact with the victims in playing "gobble, gobble" was not sexual. The court granted the Defendant a new trial with respect to the two convictions for aggravated sexual battery and two convictions for sexual battery on this basis.

Likewise, the trial court likewise granted the Defendant a new trial with respect to the aggravated sexual battery of B.B.1. after determining that the victim testified about two incidents of contact and that the State failed to make an election of the offense for which the State sought a conviction. The State does not appeal the trial court's granting a new trial for the aggravated sexual battery and sexual battery charges.

A.     Failure to Litigate the Motion to Sever

The Defendant argues that the trial court erred by denying his ineffective assistance of counsel claim based upon trial counsel's failure to litigate the motion to sever. The Defendant argues that a severance was warranted pursuant to Tennessee Criminal Procedure Rule 14 and that counsel's failure to litigate the motion was not based upon strategy. The State responds that the trial court properly denied relief because counsel's decision not to litigate the motion was based upon strategy and, alternatively, that the Petitioner failed to establish prejudice if the motion had been litigated.

The record reflects that the motion to sever the offenses was filed on June 19, 2013, and stated that most of the indictment counts alleged different victims, that the incidents involved independent and separate criminal acts, that severance was proper pursuant to Tennessee Criminal Procedure Rule 14 to ensure a fair trial, and that failing to sever the offenses would permit trial testimony that "generally" would be inadmissible. However, the motion was not litigated. Mr. Forrester testified that that a motion hearing "might have" been scheduled and that "for whatever reason, and I don't recall exactly we just didn't hear

-32-

the severance issue." When asked whether he had a strategic reason not to litigate the motion, Mr. Forrester stated that he and Mr. Cizek "had brief discussions" about the motion. However, Mr. Cizek testified that he was not involved with the severance motion and that he and Mr. Forrester did not discuss severing the charges. Mr. Forrester did not recall if he had a "definitive reason, but at some point we had it set for trial and we prepared and tried it as a group." Mr. Forrester said that severance would have had advantages and disadvantages based upon the defense theory that the "gobble, gobble" game was not for sexual gratification, but rather horseplay, and that the rape allegations were motivated by revenge. Mr. Forrester did not recall why he did not litigate the motion to sever but knew the dismissal of the indictment count involving A.F. was unrelated to the motion. Although Mr. Forrester researched the basis for obtaining severance at the time he filed the motion pursuant to Rule 14, he did not recall any of the factors to be considered when seeking a severance after reviewing Rule 14 at the motion for new trial hearing.

The record does not support the trial court's finding that Mr. Forrester chose not to litigate the severance motion as a matter of strategy. To the contrary, Mr. Forrester was unable to recall why the motion was not litigated. Although Mr. Forrester testified that he and Mr. Cizek discussed the motion to sever, Mr. Cizek testified that he was not involved with the motion and did not discuss it with Mr. Forrester. Mr. Forrester's inability to recall his motivation for not litigating the motion does not establish that he made an informed, strategic decision. Equally problematic are the trial court's determinations that three indictment counts were dismissed before the trial and that although Mr. Forrester could not recall why the counts were dismissed, the reason the severance motion was not litigated "could very well have been a tactical choice" related to the dismissed indictment counts. However, the record reflects that the three indictment counts were dismissed on June 30, 2015, the first day of the trial, and that the severance motion was filed two years earlier in June 2013. The record is absent of any proof that the dismissals and the severance motion were connected. In fact, Mr. Forrester explicitly recalled that the dismissal of the indictment count involving A.F. was unrelated to the severance motion. As a result, the record does not support the trial court's determinations that Mr. Forrester made a tactical decision to abandon the motion and that the dismissal of three indictment counts could have been related to Mr. Forrester's reason for not litigating the motion. Therefore, the record preponderates against the trial court's findings.

Appellate review of a trial court's factual findings is afforded "a presumption of correctness." *Fields*, 40 S.W.3d at 456. However, the presumption of correctness "is overcome . . . when the preponderance of the evidence is contrary to the trial court's findings of fact." *Id*. Because the evidence does not support the trial court's factual findings, we will conduct a de novo review without a presumption of correctness.

The Defendant had the burden of showing by clear and convincing evidence his factual allegation that the decision to abandon the motion to sever was not based upon a

tactical decision, namely because of the theory that the incidents involving the "gobble, gobble" game were innocent horseplay and that the rape allegations were fabricated out of revenge. Despite the nature and severity of the charges, the record does not contain conclusive evidence showing Mr. Forrester affirmatively considered utilizing the same defense theory while severing the rape allegations from the remaining charges. Likewise, Mr. Forrester was not asked explicitly at the motion for new trial hearing whether the anticipated victim testimony of the aggravated sexual battery and sexual battery allegations would bolster the victim testimony of the rape of a child and attempted statutory rape allegations. We note that although a victim's testimony alone is sufficient to support a conviction, this evidence was the State's only evidence against the Defendant. Mr. Forrester was asked, generally, if severance of the charges would have complicated the theory of the case, and he stated that "there might have been issues trying to bring some of that up because there's allegations you wouldn't want to introduce at trial. But there's also advantages to . . . severing it as well." Although Mr. Forrester researched severance before filing the motion, Mr. Forrester did not elaborate or confirm whether he considered any of the advantages and disadvantages of severance before abandoning the motion. The record does not reflect sufficient evidence to conclude that Mr. Forrester abandoned the motion based upon trial strategy or based upon an informed decision. Because the record is inconclusive in this regard, the Defendant failed to satisfy his burden of showing that Mr. Forrester did not abandon the motion based upon trial strategy. As a result, we do not need to consider whether the motion, if litigated, would have been successful. The trial court did not err by denying relief on this basis.

## B.    Failure to Advise the Defendant of the Proper Range of Punishment

The Defendant argues that the trial court erred by denying his ineffective assistance of counsel claim based upon trial counsel's failure to advise him properly of the possible sentence he could receive if convicted at a trial. The Defendant argues that he could not make an informed and knowing decision about the potential risks and benefits of a trial and a plea offer. The State responds that the trial court properly denied relief because counsel did not provide ineffective assistance.

The record reflects that Mr. Forrester testified that he was "sure" the sentencing range "[came] up in conversation" with the Defendant and his family. Mr. Forrester said he "would imagine at a minimum" he told the Defendant that he had been charged with Class A felonies, that the sentencing range for those offenses was fifteen to twenty-five years, and that the charges were in "mandatory sentence territory." Mr. Forrester also stated that he was "sure" he would have mentioned "mandatory sentence territory." However, Mr. Forrester was unsure whether he advised the Defendant that rape of a child required a minimum twenty-five-year sentence at 100% service. Relative to the sexual offender registry and community supervision for life, Mr. Forrester said that he was "sure" these topics were discussed because "that's one of the basic things of any charge like that."

-34-

He likewise said that he "like[d] to think we" calculated the Defendant's possible maximum sentence. Mr. Cizek testified that his function in the defense was trial preparation, which focused on jury selection and cross-examination of the State's witnesses. Mr. Cizek did not meet privately with the Defendant and did not discuss the Defendant's possible sentences, the consequences of losing at a trial, the sexual offender registry, and community supervision for life. Furthermore, Mr. Cizek did not have "interaction for the most part" with the Defendant and his family because the Defendant was Mr. Forrester's client.

The trial court determined that Mr. Forrester discussed the possible sentencing outcomes with the Defendant and his family and that Mr. Forrester told the Defendant and his family any sentence would require mandatory service in confinement. The record supports the trial court's general findings that possible sentencing outcomes were discussed, but the court's findings do not address whether Mr. Forrester, in accord with the law, advised the Defendant of his sentencing exposure if convicted at a trial. The record reflects that after the return of the indictment, Mr. Forrester told the Defendant and his family that the Defendant had been charged with two Class A felonies and that the sentencing range was fifteen to twenty-five years. Mr. Forrester initially did not know if he advised the Defendant that rape of a child required a mandatory minimum sentence of twenty-five years at 100% service, although Mr. Forrester knew he advised that the Defendant he was "looking at a lot of time" to serve in confinement. Mr. Forrester, likewise, thought he discussed community supervision for life and the sexual offender registry "with the family" because "that's one the basic things of any charge like that." When asked to clarify whether he advised the Defendant of the twenty-five-year mandatory sentence for rape of a child, Mr. Forrester said he would have advised that the sentencing range for a Class A felony was fifteen to twenty-five years. Mr. Forrester said that he did not memorialize in writing his conversations with the Defendant and the Defendant's family. When asked if he advised the Defendant about the sentencing range for aggravated sexual battery, Mr. Forrester said, "Well, if it's a B felony, eight to twelve" at 30% service as a Range I offender.

Mr. Forrester's testimony that he would have advised the Defendant that the sentencing range for rape of a child was fifteen to twenty-five years when asked to clarify whether he advised the Defendant of the minimum twenty-five-year sentence shows that he did not advise the Defendant in accord with the law about his sentencing exposure. A defendant convicted of rape of a child "shall be punished by a minimum period of imprisonment of twenty-five (25) years. The sentence imposed upon any such person may, if appropriate, exceed twenty-five years, but in no case shall it be less than the minimum period of twenty-five (25) years." T.C.A. § 39-13-522(b)(2)(A) (2010) (subsequently amended). Furthermore, "[t]here shall be no release eligibility for a person committing" rape of a child, and the person "shall serve one hundred percent (100%) of the sentence imposed by the court less sentence credits earned and retained," which shall not exceed

fifteen percent. *Id*. § 40-35-501(i)(1), (i)(2)(I) (2010) (subsequently amended). As a result, the record does not support the trial court's determination that counsel did not provide deficient performance in this regard.

Furthermore, when asked if he advised the Defendant about the sentencing range for aggravated sexual battery, Mr. Forrester said, "Well, if it's a B felony, eight to twelve" at 30% service as a Range I offender. This advice is, likewise, erroneous. Although aggravated sexual battery is a Class B felony and the sentencing range for a Range I, standard offender is eight to twelve years, any sentence received shall be served at 100% service, save any sentence reduction credits not to exceed fifteen percent. *Id*. § 40-35-501(i)(1), (2)(H); § 40-35-112(a)(2) (2018) (sentencing ranges). As a result, the record does not support the trial court's determination that counsel did not provide deficient performance in this regard.

Mr. Forrester testified that he "like[d] to think we" calculated the Defendant's possible maximum sentence. First, we note that Mr. Cizek did not discuss the Defendant's sentencing exposure because his focus was on trial-related matters and because the Defendant was Mr. Forrester's client. Second, the record does not show that Mr. Forrester advised the Defendant that if convicted of two counts of rape of a child and the trial court ordered consecutive service of the sentences, the Defendant faced a possible fifty-year sentence at 100% service, the remaining eight indictment counts notwithstanding. However, Mr. Forrester advised the Defendant, generally, that the sentencing range for a Class A felony was fifteen to twenty-five years, that any sentence would require, without specificity, mandatory service, that the Defendant was "looking at a lot of time" in confinement, and that the Defendant would be subject to the sexual offender registry and community supervision for life. As a result, counsel's deficient performance in this regard alone did not result in prejudice. The trial court did not err by denying relief on this basis.

## C.     Failure to Convey Eight-Year Plea Offer

The Defendant argues that the trial court erred by denying his ineffective assistance of counsel claim based upon trial counsel's failure to convey the State's eight-year plea offer. He asserts that he would have accepted the offer if he had known about the offer and the proper range of punishment he faced after a trial. The State responds the trial court properly denied relief because counsel conveyed the offer to the Defendant and, alternatively, that the Defendant failed to establish prejudice.

Trial counsel has an obligation to "promptly communicate and explain to [a] defendant all plea offers made by the prosecuting attorney." *Missouri v. Frye*, 566 U.S. 134, 144 (2012); *see Nesbit v. State*, 452 S.W.3d 779, 800 (Tenn. 2014); Tenn. Sup. Ct. R. 8, RPC 1.4(a)(1), cmt. [2] (requiring a criminal defense attorney to "promptly inform" a client about the substance of a "proffered plea bargain"). "[C]riminal defendants require

effective counsel during plea negotiations. Anything less . . . might deny a defendant effective representation by counsel at the only stage when legal aid and advice would help him." *Frye*, 566 U.S. at 144 (internal quotations and citations omitted). A defendant has the burden of establishing trial counsel provided ineffective assistance during the plea negotiation process by showing that "but for counsel's deficient representation, (1) the defendant would have accepted the [offer], (2) the prosecution would not have withdrawn the offer, and (3) the trial court would have accepted the terms of the offer." *Nesbit*, 452 S.W.3d at 801; *see Lafler v. Cooper*, 556 U.S. 156 (2012). If a defendant satisfies this burden, the appropriate remedy is to vacate the conviction and to remand the case to the trial court with instructions for the State to reinstate the plea offer and "to negotiate in good faith." *Harris v. State*, 875 S.W.2d 662, 667 (Tenn. 1994).

The record reflects that on June 10, 2014, Mr. Forrester received a letter from the prosecutor extending an eight-year plea offer. The letter stated that Mr. Forrester had "asked about an offer at some point . . . so I thought I would start a dialog." The terms of the offer reduced the two counts of rape of a child to rape and required the Defendant to plead guilty to the remaining eight counts as charged in exchange for concurrent, minimum sentences.

Mr. Forrester's testimony relative to whether he conveyed the eight-year offer to the Defendant was equivocal, at best. On direct examination, Mr. Forrester testified that he received the offer but that the Defendant's family was adamant that the Defendant was not guilty and was not going to plead guilty. Mr. Forrester said that the Defendant's family was not going to entertain a plea "at that time and not especially to eight years" but that the Defendant might have been amenable to a guilty plea. When explicitly asked if he conveyed the offer to the Defendant, Mr. Forrester initially stated,

> I don't – we've talked to him yes, not particularly and it's because of how this case went. At first they had offered the eight years and we still have – and again I still think even if we had pulled him aside to talk to him they would not have – I don't know if the family – I don't think he would have, at the time, taken any plea.

On cross-examination, however, Mr. Forrester testified that his "impression . . . from the family was that unless [Mr. Forrester] got [the Defendant] such a good deal that [the Defendant] just couldn't pass up, [Mr. Forrester was] not sure they would – [the Defendant] would have taken any deal." When explicitly asked again if he discussed the offer with the Defendant, Mr. Forrester stated, "I didn't ever give him the yes or no verbatim are you going to take the deal or not." When asked if he had a distinct memory of discussing the offer with the Defendant, Mr. Forrester clarified, "No, I'm saying that I'm sure it was brought up and I'm sure it was not extensively discussed because again [the Defendant] was not guilty." Mr. Forrester admitted that he did not speak privately to the Defendant

about the offer and that he did not advise the Defendant, generally, the decision to accept or reject an offer belonged to the Defendant.

The trial court determined that the eight-year plea offer was conveyed to the Defendant based on Mr. Forrester's testimony. However, Mr. Forrester did not have a distinct memory of discussing the offer with the Defendant, although he believed "it was brought up." Mr. Forrester stated hypothetically that the Defendant would not have accepted the offer even if Mr. Forrester had advised the Defendant about the offer because the Defendant's family would not have allowed it. Mr. Forrester's testimony about his belief that the Defendant would not have considered an eight-year offer is inconsistent with his testimony that the Defendant could have been amendable to a guilty plea offer, although the family was adamantly against a guilty plea. Mr. Forrester's obligation as counsel belonged to the Defendant, not his family. Likewise, Mr. Forrester's belief that the Defendant would not have considered an eight-year offer is inconsistent with Mr. Forrester's testimony that he initiated plea negotiations with the prosecutor at the "behest," or directive, of the Defendant. Furthermore, the court found that Mr. Cizek testified similarly to Mr. Forrester that the Defendant and his family were adamant about the Defendant's not pleading guilty. However, Mr. Cizek testified that he did not have "interaction for the most part" with the Defendant and the Defendant's family and that he relied upon Mr. Forrester's assertion that the Defendant and the Defendant's family were "firmly entrenched in the belief that [the Defendant] was not going to plea to anything." Mr. Cizek stated that he did not discuss the offer with the Defendant and that Mr. Forrester would have spoken to the Defendant about the offer. As a result, the evidence preponderates against the trial court's finding that the eight-year plea offer was conveyed to the Defendant.

Although the trial court discredited the Defendant's testimony that he did not learn of the offer until after the trial, the court did not render a credibility finding relative to Ms. Rogers, the Defendant's sister, who primarily communicated with Mr. Forrester. Mr. Rogers testified that she did not learn of the offer until after the trial. Ms. Rogers was present for all but two meetings, which is supported by Mr. Forrester's testimony. The record reflects that the first meeting involved a twenty-minute discussion between the Defendant, Mr. Forrester, and an investigator, at which time Mr. Forrester said he "debriefed" the Defendant. The second meeting occurred when the Defendant underwent the polygraph examination. Although the testimony did not reveal the dates of these meetings, Ms. Rogers testified that the private debriefing occurred before the polygraph examination. Mr. Forrester's June 17, 2013 letter to the prosecutor, which discussed the motion to sever, reflects that the Defendant had completed and passed a polygraph examination. Afterward, Mr. Forrester "asked [the prosecutor] about an offer" and subsequently received a June 10, 2014 letter in which the State extended the eight-year offer. As a result, the two meetings at which Ms. Rogers was absent occurred before the State extended the eight-year offer. She testified about each meeting with the Defendant and Mr. Forrester. She likewise

-38-

testified that the offer was never discussed at the meetings and that she did not learn of the offer until after the trial. Based upon this evidence, along with Mr. Forrester's inability to confirm the offer had been conveyed to the Defendant, we conclude that the trial court erred by determining that the Defendant failed to establish by clear and convincing evidence that the offer was not conveyed. Regardless of whether counsel thought the Defendant would reject the offer because his family was adamantly against a guilty plea, counsel was obligated by law and the rules of professional responsibility to convey the offer to the Defendant and to explain its substance to the Defendant. *See Frye*, 566 U.S. at 144; *Nesbit*, 452 S.W.3d at 800; Tenn. Sup. Ct. R. 8, RPC 1.4(a)(1), cmt. [2]. As a result, the record does not support the trial court's determination that counsel did not provide deficient performance in this regard.

The evidence reflects, which we have already discussed above, that Mr. Forrester erroneously advised the Defendant that he faced a potential sentence of fifteen to twenty-five years' confinement if he were convicted of the rape of a child. Mr. Forrester, likewise, erroneously advised the Defendant that aggravated sexual battery required 30% service as a Range I offender. Although Mr. Forrester advised the Defendant that he faced a lengthy prison sentence, Mr. Forrester failed to inform the Defendant that rape of a child requires a minimum twenty-five-year sentence at 100% service and that, if convicted and the trial court ordered consecutive service, the Defendant faced a fifty-year-sentence at 100% service, the remaining eight charges notwithstanding. Furthermore, Mr. Forrester testified that he initiated plea negotiations at the behest of the Defendant and that although the Defendant's family was adamantly against the Defendant's pleading guilty, the Defendant might have been amenable to a guilty plea. Notwithstanding the trial court's rejection of the Defendant's credibility, this evidence supports a conclusion that the Defendant would have accepted the offer if Mr. Forrester had accurately explained the Defendant's sentencing exposure for the ten-count indictment, conveyed the eight-year offer to the Defendant, and explained the offer significantly reduced the Defendant's required service in confinement.

The eight-year offer was significantly lower than the Defendant's sentencing exposure, and given the nature of the mandatory sentence for the two rape of a child charges and the potential for consecutive service, the offer reduced what might have been an effective life sentence to eight years at 100% service for rape. *See* T.C.A. § 40-35-501(i)(1), (2)(G). Mr. Forrester stated that for the Defendant to accept an offer, it would have to be "such a good deal that [the Defendant] couldn't pass up." However, Mr. Forrester's failure to communicate the Defendant's significant exposure if convicted at a trial and to discuss fully the implications of the eight-year offer complicates the matter. The record reflects that the Defendant was a young adult who had no previous involvement with law enforcement and the criminal justice system, that he had a documented history of mental illness, and that he did not have the opportunity to weigh a possible fifty-year sentence at 100% service against the offer of eight years at 100% service. As a result, the

-39-

trial court erred by concluding that the Defendant failed to establish by clear and convincing evidence that he would have accepted the eight-year offer if he had known of its existence and of the significant sentencing exposure he faced if convicted as charged in the indictment.

In reaching this conclusion, we have considered the prosecutor's September 30, 2014 letter withdrawing the eight-year plea offer. The letter states, in relevant part, "I know earlier we had put an offer on the table for Mr. King's consideration, but given the fact that he has to date declined that offer and in light of the more recent developments in the case . . . we are taking that offer off of the table." Although the trial court interpreted this language as evidence that the Defendant had rejected the offer, and therefore had knowledge of the offer, the language of the letter is ambiguous and subject to more than one interpretation.

Furthermore, the record reflects that the State's offer was extended on June 10, 2014, and revoked on September 30, 2014. The State initially sought to revoke the Defendant's bond on December, 18, 2013, and the trial court denied the motion on May 30, 2014, although the court modified the conditions of release. The State extended its offer ten days later. The State, again, filed a motion to revoke the Defendant's bond on August 25, 2014, and the trial court revoked the Defendant's bond on September 15, 2014. However, the State's offer remained effective while the revocation hearing was pending and for an additional fifteen days after the Defendant's bond was revoked. As a result, the record supports a determination that the prosecution would not have withdrawn the offer if the Defendant had known of the offer and accepted it. Furthermore, the record does not contain any evidence indicating that the trial court would have rejected an eight-year plea agreement in this case.

As a result, we conclude that the trial court erred by determining that the Defendant failed to establish by clear and convincing evidence that he would have accepted the eight-year offer if he had known of its existence and of the significant sentencing exposure he faced if convicted as charged in the indictment. Because the Defendant received the ineffective assistance of counsel, we vacate the Defendant's convictions and remand this case to the trial court with instructions for the State to reinstate the eight-year offer and to negotiate in good faith.

D.    **Failure to Advise and Prepare the Defendant for Trial**

The Defendant argues that the trial court erred by denying his ineffective assistance of counsel claim based upon trial counsel's failure to advise and to prepare him for the trial. He likewise argues that a *Momon* hearing was not held during the trial, showing that the Defendant was not provided any advice about whether he should testify. The State

responds that the trial court properly denied relief because counsel did not provide ineffective assistance.

The record reflects that before the return of the indictment, the Defendant, his family, and Mr. Forrester met to discuss the potential charges. Mr. Forrester said that they discussed the allegations, the potential victims, and the "gobble, gobble" game. After the return of the indictment, Mr. Forrester, the Defendant, and Ms. Rogers reviewed the discovery materials, the Defendant and his sister made notes about the materials, and they provided their notes to Mr. Forrester. Although Mr. Forrester did not recall the number of times he met with the Defendant, Mr. Forrester knew it was more than a few times. Mr. Forrester spoke to Ms. Rogers more than to the Defendant.

Mr. Forrester testified that the Defendant's family thought A.F. was the "root cause" of the charges. The Defendant reported that he informed P.N. that A.F., P.N.'s then-girlfriend, was dating another boy, that A.F. learned about the Defendant's telling P.N., and that A.F. threatened to "get back at" the Defendant. Mr. Forrester said that he spoke to the Defendant and his family about the theory that the rape allegations were the result of a revenge conspiracy and that the aggravated sexual battery and sexual battery allegations were horseplay and not for sexual gratification. Mr. Forrester said that he met with the Defendant and his family at each court appearance and at the bond revocation hearings. As a result, the record supports the trial court's determination that Mr. Forrester discussed the trial strategy and the defense theory with the Defendant.

The Defendant's bond was revoked, and he remained in custody from September 17, 2014 until the June 2015 trial. Although Mr. Forrester said that he met with the Defendant at the jail two or three times, the jail visitation records did not reflect he met with the Defendant while in confinement until the time of the trial. Mr. Forrester agreed he did not send any correspondence to the Defendant during the nine months he was confined at the jail. Mr. Forrester met with the Defendant one or two days before the trial, and Mr. Forrester did not recall whether be brought any materials to the meeting. Mr. Forrester believed Mr. Cizek attended the meeting. However, Mr. Cizek testified that he did not meet with the Defendant during his pretrial confinement.

Although not required when a defendant elects to testify, the trial court did not hold a *Momon* hearing to determine (1) whether the Defendant had consulted with Mr. Forrester and Mr. Cizek in making the decision whether to testify, (2) whether the Defendant had been advised by counsel of the advantages and disadvantages of testifying, and (3) that the Defendant had voluntarily decided to testify on his own defense. *See Momon v. State*, 18 S.W.3d 152, 163 (Tenn. 1999); *see also Mobley v. State*, 397 S.W. 70, 91 (Tenn. 2013) (declining to extend *Momon* to cases in which a defendant elects to testify). As a result, the trial transcript does not contain evidence reflecting that Mr. Forrester and the Defendant discussed the Defendant's right to testify, Mr. Forrester's advice relative to whether the

Defendant should or should not testify, and whether the Defendant had been advised the decision to testify belonged to the Defendant. Furthermore, the only evidence presented at the motion for new trial hearing was the Defendant's discredited testimony that Mr. Forrester did not discuss testifying at the trial. Mr. Forrester was not asked if he and the Defendant discussed whether the Defendant should testify at the trial and the advantages and disadvantages of each choice. Although the record does not support the trial court's determination that Mr. Forrester and the Defendant discussed whether the Defendant should testify at the trial, the record supports a determination that the Defendant failed to establish his claim by clear and convincing evidence. As a result, the trial court did not err by denying relief on this basis.

## E.     Cumulative Error Doctrine

The Defendant argues that the cumulative effect of trial counsel's deficient performance requires relief.

The cumulative error doctrine requires relief when "multiple errors [are] committed in the trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76-77 (Tenn. 2010) (internal citations omitted); *see State v. Jordan*, 325 S.W.3d 1, 79 (Tenn. 2010) ("'[T]he combination of multiple errors may necessitate . . . reversal . . . even if individual errors do not require relief.'") (quoting *State v. Cribbs*, 967 S.W.2d 773, 789 (Tenn. 1998)).

Because we have already concluded that the Defendant is entitled to relief due to counsel's failure to advise the Defendant about the proper range of punishment and to convey an eight-year plea offer, cumulative error analysis is not required.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are reversed. The Defendant's convictions are vacated, and the case is remanded to the trial court with instructions for the State to reinstate the eight-year plea offer and to negotiate in good faith.

_____
ROBERT H. MONTGOMERY, JR., JUDGE

-42-